May it please the Court, I'm Kirby Heller. I represent the government. I'd like to reserve three minutes for rebuttal. The question in this case is whether Agent Conway's questioning of Mr. Chen constituted interrogation. This Court has consistently stated that questioning, even in a custodial setting, is not necessarily interrogation. Instead, the question is whether the questions are reasonably likely to elicit incriminating answers. That determination is made by looking at all the circumstances of the particular case. Now, the district court made two fundamental errors. First, by finding that Agent Conway had a dual purpose in mind when he interviewed Mr. Chen, he ignored the testimony, the consistent testimony of the agent, that the only purpose of the interview was to get information about Mr. Lee, who he suspected of alien smuggling. That was the sole purpose of the interview. There wasn't any testimony that he was trying to get information having to do with Chen and his illegal status. But, of course, the district judge is not required to take the testimony as true. Well, that's correct, Your Honor, although there are certainly no statements in the record that he cast any question on the credibility of the agent. But in addition, there was no ---- Well, I'm not sure that that's right. For example, I'm reading from excerpts of records, page 41. This is testimony with Mr. Conway during cross-examination. Question. I'm now on page 6, excuse me, line 6 of page 41. I'll wait until you get there. Are you there? Page 41, line 6. Question. Now, you also stated that you had no suspicion that Mr. Chen was involved in criminal activity at the time you were interviewing. Is that correct? Yes, that's correct. Question. Well, sir, are you aware of the crime of bringing in or harboring an alien? Yes. Question. Are you aware of using a false passport? Yes. Question. Are you aware of 8 U.S.C. 1321, improper entry by an alien? Yes. Question. Yet, it is your testimony that you did not think he was involved in criminal activity when you interviewed him? Yes, that's correct. Well, what did you think? Was he a tourist? It's preposterous that you did not think that he violated the law because illegal entry is a violation. Well, that's correct, Your Honor. My point before was just that the district court didn't make any findings about the credibility of the agent. But what you said was there's no ground to believe, based on his testimony, that he was not telling the total truth. And I said, well, I'm not sure that that's right. Well, really, the fundamental question is just what you're getting at, Your Honor, and that is whether this theoretical possibility, this mere possibility that an alien could be prosecuted for the misdemeanor offense of illegal entry is sufficient to convert questioning into interrogation. Because all questioning, of course, of an alien is going to raise the possibility of that prosecution for that misdemeanor offense. So that is really the fundamental question in this case. And the case that – your case is Salgado, right? That's correct, Your Honor.  stronger than Salgado, the primary factors that the Court relied on in Salgado are present here. First, that the questioning wasn't about any kind of immigration violation of Mr. Chen. In fact, it was all geared to finding out about Lee. Second, Mr. Chen was not in custody on any kind of criminal offense having to do with his immigration status. That was the issue in Mata Abundis. Let me ask you, here's language that I think is troublesome for you, and I want to ask you how you can either avoid its consequence or how I may be misunderstanding. I'm simply reading from the majority opinion in Salgado, Roman II, second paragraph. If Salgado had been in custody on charges relating to his immigration status, then questions about birthplace and citizenship might have been reasonably likely to elicit an incriminating response, in which case he should have been Mirandized beforehand. Why is this case not the case described in that if clause? I believe that what the Salgado Court was referring to there when it talked about charges were criminal charges. But it didn't say criminal. It just said charges. It did just say charges. But the very next paragraph, it does talk about criminal offenses. Yes, but I'm after the paragraph that I'm reading from and saving out. Obviously, the situation in Salgado was Salgado was being held on criminal charges but in the state system for different charges. In that case, the INS agent was interviewing solely and very obviously for the purpose only for a civil deportation. Yes, that's correct. This is not the case here. I mean, we clearly have a criminal investigation. The only question is who's being investigated and who's liable to be charged. That's correct, Your Honor. As I said, that's how I read that language in Salgado's referring to criminal offenses. I think that's your best response. There are many circumstances in this case also that corroborate Agent Conway's testimony that this questioning really was not at all geared to Mr. Chen. Perhaps most significantly is that nothing was done after this interview, and he only became suspicious of Mr. Chen and the other aliens more than a month later when other suspicious circumstances came to light. It was at that time that a criminal investigation began. So there was nothing either before the interview or during the interview that one could say made Agent Conway anticipate or assume that there was a criminal investigation. Again, that's a very significant factor that distinguishes this case from Mata Abunda's, for example, and makes it more like Salgado. In addition, of course, all the papers that were filled out, all the reports in connection with Mr. Chen's detention were administrative and indicated this was just administrative action. And, in fact, the fact that he was offered the opportunity to voluntarily be removed as opposed to go to a hearing in front of an immigration judge further confirms that point. They were not anticipating at all that there was going to be a criminal prosecution, and they were going to be happy if he just removed and was removed voluntarily. So, ultimately, the fact that he was an illegal alien, although, again, that subjects him to possible prosecution, wasn't in the mind of this agent. And I think since it's only a theoretical possibility, it's difficult to say, then, that it was that the questions were reasonably likely to elicit incriminating responses. Well, it's clearly an incriminating response. The only question is, what do they do with it? I mean, as soon as he says, I'm here illegally, that is incriminating. Well, yeah. That is incriminating, but it's incriminating for something that they have no intention of prosecuting. Well, but their intention changed pretty fast. Well, it only changed when other things happened in this case. It didn't change pretty fast. Well, you know, not really. They were always after the head smuggler, and the criminal charges are then brought against Mr. Chen in an attempt to put pressure on him so he'll testify. So, this is not an unforeseeable consequence. We do get pressure put by the prosecutors, quite legitimately in many cases, on the little fish, so they'll roll over on the big fish. But I think in these circumstances, Your Honor, we don't have that happening until later on. Again, if that were the case, then criminal charges or criminal investigation would have begun right away. But it didn't. It only began at the end of February when other suspicious things happened, that there were a bunch of these aliens were all represented by the same lawyer, and unrelated people from Guam were posting bombs. That was what triggered in these agents' minds the decision to begin a criminal investigation. And I think what this interview was, was more akin to what the Miranda Court and other courts have called on-the-scene questioning. Their intent was to do some kind of investigation against Lee, the smuggler. The witnesses to that, of course, are these illegal aliens, and they're trying to get the facts of that. And that, although it's happening in custody because these people are aliens, illegal aliens, it's just, it is an on-the-scene questioning of what are the facts of this case, and what are the facts of the case, and what are the facts of the case that are being submitted. I'll reserve the rest of my time for a while. Okay. Thank you. Good morning, Your Honors. May it please the Court. My name is John Gorman. I'm the Federal public defender from Guam. The District Court was correct in suppressing Mr. Chen's statements because this was a He was in custody, and he was never given his Mirandas. It is undisputed, although you would, the government somewhat tries to get around the issue, but it is undisputed that Mr. Chen was in custody. It's also undisputed he was never given his Miranda warnings. As the government says, the only question here today is whether Conway's questioning of my client on January 10th, or January 12th, 2001, were reasonably likely to elicit incriminating response from my client. It is a fact-bound inquiry, and when you look at the facts in this case, you cannot come to any other conclusion, I would respectfully submit, that this was Well, Mr. Gorman, it is clear that, at least at the beginning, the investigation focused on, I forgot the guy's name, but the guy, you know, running the apartment and that kind of stuff, and I suppose it's possible to think, well, maybe this guy, this guy, meaning your client, could have been thought of as a co-conspirator, you know, some kind of an aider and abetter, but the investigation clearly was focused on smuggling and not upon, you know, illegal alienation, alienage per se, right? Absolutely. And what reason was there to suspect, in that kind of investigation, that your client's answers would be incriminating? Because as, as Your Honor pointed out earlier, the purpose of, this is a, backtrack a little bit, alien smuggling is an international, ongoing criminal conspiracy, spanning China into the United States. There's a whole range of people involved, from the snakeheads in the province to the people on the boats to the people on Guam. They're all part of this ongoing criminal enterprise. So, and as in most federal criminal prosecutions, you want to start small. You start with the little guy, you roll your way upward. They know from the testimony of Mr. Conway at the grand jury that Mr. Lee was directly involved in the smuggling of my client, Mr. Lin. So, therefore, as I say, he's either a co-conspirator, a beneficiary of this smuggling conspiracy. So, of course, he is a natural target. If they, when they go there and they arrest these folks, they don't find the person they're looking for, Mr. Big, Doosan Lee. They do find my client, who they know is involved with Mr. Lee. So, what are they going to do? They're going to put pressure on my client, Mr. Lee. You read the last sentence from the U.S. attorney from the grand jury testimony, where she said, just before she submits it to the grand jury, this was back on May 9, 2001. This is on page 49 of my supplemental experts records. It's obvious what I'm doing, of course. I'm after Ho Chun Lee and no one will cooperate with me. So, I'm going to put on a little pressure. That's what this is. This is an investigation of a major international people smuggling ring. The only person they. All right. But, still, getting back to the same point, Mr. Gorman, I don't care if it's Guam or, you know, Southern California or Arizona, but it's very unusual, although, you know, as the portion of the transcript Judge Fletcher read shows it's a technical violation to be an illegal alien here. It's very unusual for the smuggly, we'll call him, to be prosecuted solely because he's an illegal alien present in this country without the permission of the attorney general. Right? Those prosecutions are very rare in this kind of investigation. It's usually the person doing the smuggling and whoever's helping them out. I would have to disagree, Your Honor. And what Mr. or what Agent Conway said during his testimony in the motion to suppress, he says these things are not usually prosecuted. He didn't say it's a matter of policy. He didn't say, as the attorney for the government said, it's highly unlikely. And then, and as I noted in my brief, there have been between 1998 and 2004, 48 prosecutions of this type in Guam. On September 1st, just before I filed this brief, there were four people who were brought. So it is not a highly, in Guam at least, that is not a highly theoretical prosecution. And they're not only is he possibly being prosecuted for illegal entry. He was prosecuted for perjury. And then we also have he could be a co-defendant in this case. At that time, they didn't know who really they had in front of them and whether or not he was an active participant. He might have been a co-conspirator in this. Many times in these smuggling rings, they use one person who's an escort. You say if they didn't know, then how can you say it was reasonably likely to elicit incriminating responses? They did know he was involved in an alien smuggling operation. They know that from their confidential informant who they used to get the search warrant who said that he was present when the five men named Chen were picked up on September 24th of 2000. So they knew that there was an ongoing criminal conspiracy on a large scale and that my client was a part of it, whether he was just a beneficiary of this and therefore is guilty only of illegal entry or whether he was a co-conspirator. How do you distinguish this case from Salgado? Both Salgado and Solano Goldbees are good for the prosecution, but there are key factual differences. Both Salgado and Solano involved the investigation and interrogation or questioning of individuals by law enforcement people and then they were prosecuted years later after future crimes were committed. In Solano Goldbees, it was two years, I believe, Salgado won. And as this court notes in Salgado, in each, the response only became incriminating after a substantial period of time and after a defendant had been deported, had illegally reentered the country and had been arrested on state charges unrelated to his immigration status. The theory being how could they possibly know when they interviewed those two defendants that they would commit crimes in the future. This is a major factual difference because they were investigating here with my client a crime that had happened in the past. So, of course, they can't foresee that the gentleman would leave the country, reenter, commit another crime. So there is a major factual difference. I would ask the Court also to consider, and this is language from Salgado on page 1174. Of course, for us, we like MATA and we think MATA controls. But the language from Salgado, unlike MATA, the person asking questions did not know and there were three things this person did not know. One, from pending state charges, a federal prosecution could result. Well, this is totally different. These are both federal, immigration and federal district court. Second, they did not refer alien for criminal investigation or initiate one themselves. This is a major difference. He not only, Mr. Conway, referred my client for criminal investigation and initiated it, he did everything in this case. Second, and the third difference was the defendants were not prosecuted forthwith on federal immigration charges. Here's where the government may attempt to hang their hat on the forthwith question because in MATA there was only a space of three hours. But here, when you look at the timeline, certainly this was not three hours, this was four months. He was arrested on January 11th. He was interrogated, questioned by Mr. Conway on the 12th. A report was prepared two weeks later, so that would put it at January 26th. This is a criminal investigation report. The report was signed by Mr. Conway and sent to the prosecutor on February 5th. He was eventually indicted on May 10th after the grand jury on May 9th. This is a continuing investigation. It is not exactly forthwith. It was not done within hours, but we have a continuing process here that starts with when they got the search warrant on the 10th of January all the way through four months later when they actually get the indictment of my client. So it is not forthwith, but there is no break. It is a continuing investigation of my client. Also, there's another factual difference that I would ask the Court to look at significantly. That is, there's a theme throughout the government's argument that they only became interested criminally in my client until after he was bonded out and people who didn't know him bonded out. And that's what they say, ah, that's when the light goes on. That's when we're going to start a criminal investigation. That is absolutely untrue. It is unsupported by the record. It is unsupported by the agent's own testimony. We have the agent's testimony, and this is from page 50 of the government's excerpts of record. This is Agent Conway's testimony at the motion to suppress. On the date that I signed it, we were already looking into whether or not they lied on their application. And we know from previous testimony the date that he signed that complaint and he sent it to the AUSA was February 5th. He was not bonded out until the 22nd. So this theory that this whole investigation sprang up on February 22nd is directly contradicted by the agent's own testimony that says as of February 5th, when he sent it to the AUSA, he was already looking at them. And I would suggest to you he was always looking at them. Wait a minute. When he says the first part you read on the date that I signed it, talking about signed what? This is the criminal investigation report that he sent to the prosecutor. He prepared, he interrogated my client on the 12th. And when you read the transcript, he talks about he took two weeks later, he prepared that report. That would put it at January 26th. That was a report to the? To the prosecutor. To Karen Johnson? Yes. Where was running that? Karen Johnson. That was two weeks later, so that's January 26th. Then he talks about he signed the report, he reviewed it, and he sent it to the AUSA on February 5th. So the idea that this whole investigation stemmed from the bonding out process on February 22nd is directly contradicted by the facts and the testimony in this case. Okay. Thank you very much. Thank you, Your Honor. You've saved a little time, and we let the public defender go over a little. If you need, whatever you need to say, we'll make sure you get a chance to say it. Thank you, Your Honor. Just to turn to the last point about the testimony on the excerpts of record, page 50. Admittedly, the agent is confused, and he's confused a little bit about the dates and the events. But I think what comes through clearly in that testimony is that what raised his suspicion was the bonding out. I think he's confused about the dates when you read the two pages, 50 and 51. But, you know, he'd have to be a nitwit not to be suspicious from the get-go. That is to say, they have a tip, they raid this residence, they find all these illegal aliens in there together, and I think it's entirely within the sort of boundaries of the facts and the inferences that can be drawn from the facts for the district judge to have concluded that very early on, long before the bonding out by these undisclosed, whoever these people are, that this was a criminal investigation aimed at the head smuggler. Well, it was certainly aimed at Lee and his smuggling. From the beginning. From the beginning, it was aimed at that. And to say that we became suspicious that these people had been smuggled only when they were bonded out is totally inconsistent with what they did from the very beginning. They were suspicious of Lee from the very beginning, and they thought these people had been smuggled by him. Now, they didn't have much evidence, but that's what they thought. Well, they thought that some of these individuals were smuggled by them, Your Honor. I don't believe there's anything in the record. Well, let me back up. In the grand jury, Agent Conway said the informant told us that these people, Mr. Chen and the others, were smuggled in by Lee. But we don't he doesn't say in that testimony when he learned that. When you look at the affidavit in support of the search warrant, certainly no names are mentioned. And the information they had from the informant at the time was that Mr. Lee had smuggled in five, maybe six people. When they go to the apartment, there are 12. So there are a lot of people that they can't account for. But there are certain facts upon that administrative removal that suggest they certainly weren't suspicious at that time or that Chen was necessarily one of the people that Lee had smuggled in. The date they put in for his entry all along was the June date, which is the date that he had given. They credited his account of how he got in. He came in on a fishing boat, and when they got to shore, he walked away. Those were the events they put down. And again, the fact that they were willing to let him go back to China to be removed voluntarily shows that they weren't going to prosecute him for that. They didn't suspect him of being part of Lee's smuggling. Now, he could have been a smuggler, but in their minds, that was not something that they prosecuted. And so for that reason, the information they got about his alienage, that was information they had already. And that really is the key point in Salgado, is that, of course, when the INS agent interviewed Salgado in his jail, he asked questions about his alienage. That's a Federal – that's a Federal crime. It was at the time that he asked that question. But that wasn't enough to cross the line into interrogation, despite the fact, of course, that the dissent made that point that didn't persuade the majority. And that's what we have here. Thank you. Thank both sides for helpful arguments. The case of United States v. Chen is now submitted for decision.
judges: Tashima, W. Fletcher, Shea